IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIC T. MADLOCK, | ) | CASE NO.  3:24-CV-01498-JRK |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP, II |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Eric Madlock ("Plaintiff" or "Madlock"), challenges the final decision of Defendant, Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In January 2020, Madlock filed applications for POD, DIB, and SSI, alleging a disability onset date of June 9, 2019, and claiming he was disabled due to enlarged liver, blood sugar, problems with feet, hypertension, and heart condition.  (Transcript ("Tr.") 17, 75.)  The applications were denied initially and

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

1

upon reconsideration, and Madlock requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

On March 3, 2022, an ALJ held a hearing, during which Madlock, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On March 30, 2022, the ALJ issued a written decision finding Madlock was not disabled.  (*Id.* at 17-38.)  The ALJ's decision became final on September 8, 2022, when the Appeals Council declined further review.  (*Id.* at 1-8.)

On November 7, 2022, Madlock filed his Complaint to challenge the Commissioner's final decision.  (*Id.* at 2737-41.)  On February 10, 2023, on joint stipulation of the parties, the Court remanded the case back to the Commissioner for further administrative proceedings.  (*Id.* at 2744.)

On June 14, 2023, the Appeals Council remanded the case to an ALJ.  (*Id.* at 2745-48.)

On January 30, 2024, a new ALJ held a hearing, during which Madlock, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 2617.)  On June 5, 2024, the ALJ issued a written decision finding Madlock was not disabled.  (*Id.* at 2617-37.)  The ALJ's decision became final on August 9, 2024, 65 days after the issuance of the ALJ's decision.  *See* 20 C.F.R. §§ 404.900(a), 404.984(d), 416.1400(a), 416.1484(d).

On September 3, 2024, Madlock filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 8-9.) Madlock asserts the following assignment of error:

(1) The ALJ violated 20 C.F.R. § 404.1520c during the evaluation of Dr. Kemmler's treating source opinions.

(Doc. No. 6.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Madlock was born in June 1978 and was 45 years-old at the time of his January 2024 administrative hearing (Tr. 2617, 2634), making him a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a limited education. (Tr. 2634.) He has past relevant work as a punch press operator and forklift operator. (*Id*.)

### B.    Relevant Medical Evidence[2]

On February 15, 2019, Madlock saw Jed Kohne, PAC, at Kemmler Orthopaedic Center for follow up of his right knee pain. (*Id.* at 603.) Madlock reported he was doing "ok"; he continued to have some discomfort, but he was doing better, and he wanted to try and go back to work. (*Id.*) On examination, Kohne found positive McMurray's testing of the right knee, as well as discomfort to palpation over the patellofemoral region and slight discomfort over the medial joint line. (*Id.*) Kohne further found an active range of motion of 0 to 125 degrees and an antalgic gait favoring the right lower extremity. (*Id.*) Madlock's diagnoses consisted of chondromalacia of the right knee, a sprain of unspecified collateral ligament of the right knee, and a sprain of unspecified site of the right knee. (*Id.* at 603-04.) Kohne noted that Madlock "desires to entertain full duty work activity" and would also continue with the worker's comp approval process. (*Id.* at 604.)

On March 15, 2019, Madlock saw James Kemmler, M.D., for follow up. (*Id.* at 601.) Madlock reported continued right medial knee pain with activity. (*Id.*) Madlock denied any changes since his last visit. (*Id.*) On examination, Dr. Kemmler found unchanged physical findings. (*Id.*) Dr. Kemmler noted Madlock wore a brace and walked with a limp. (*Id.*) Dr. Kemmler further found tenderness over the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Madlock challenges only the ALJ's findings regarding his physical limitations, the Court further limits its discussion of the evidence to Madlock's physical impairments.

medial joint line of the right knee, no gross instability, range of motion of 0 to 100 degrees, pain with McMurray's testing, no calf tenderness, and intact sensation. (*Id.*) Dr. Kemmler noted Madlock was "getting closer to approval for diagnosis" and once approval came through without appeal, he would schedule Madlock for surgery. (*Id.*)

On April 5, 2019, Madlock saw Dr. Kemmler for follow up and complained of increased right knee pain. (*Id.* at 599.) Madlock reported he was ready to schedule surgery now that he had received approval. (*Id.*) On examination, Dr. Kemmler found unchanged physical findings. (*Id.*) Dr. Kemmler noted Madlock wanted to proceed with surgery. (*Id.*)

On April 10, 2019, Madlock underwent right knee arthroscopy with abrasion-plasty and micro drilling of the medial femoral condyle. (*Id.* at 2147.)

On April 25, 2019, Madlock saw PAC Kohne for his two-week post-op appointment. (*Id.* at 597.) Madlock reported that he had started physical therapy and was going three times a week. (*Id.*) Madlock rated his pain as a 9/10 and requested more analgesic. (*Id.*) Kohne noted Madlock walked in the hallways with the use of a crutch and had an antalgic gait. (*Id.*) Kohne noted Madlock was to proceed with physical therapy and using one crutch to assist with walking. (*Id.* at 598.) Madlock was to return to work on a sit-down basis only and utilize the crutch while at work. (*Id.*)

On May 9, 2019, Madlock saw Kohne for follow up and reported "slow gains" since his last appointment. (*Id.* at 595.) On examination, Kohne found a well-healed incision, improving strength, improving range of motion, and decreased discomfort over the medial joint line. (*Id.*) Kohne noted Madlock walked with the assistance of a cane. (*Id.*)

On January 9, 2020, Madlock saw Dr. Kemmler with complaints of increased joint pain and swelling of the right knee. (*Id.* at 591.) Madlock reported that Tylenol provided some relief. (*Id.*) On examination, Dr. Kemmler found mild asymmetry of gait, mild effusion of the right knee, no warmth or

4

erythema, range of motion of 0 to 115 degrees, stability of the knee, moderate quad weakness, and intact sensation. (*Id.*) Right knee x-rays taken that day revealed mild degenerative changes. (*Id.* at 592.) Dr. Kemmler administered a steroid injection and recommended Madlock work on a home exercise program. (*Id.*)

On January 30, 2020, Madlock saw Dr. Kemmler for follow up of his right knee pain. (*Id.* at 589.) Madlock described his pain as achy, throbbing, and constant. (*Id.*) He rated his pain as a 3-8/10, and it was worse with work, walking, and activity. (*Id.*) The pain affected his daily activities. (*Id.*) Associated symptoms included swelling, "tight" feeling after work or activity, and abnormal noises with knee movement. (*Id.*) On examination, Dr. Kemmler found continued mild asymmetry of gait, mild effusion, crepitus, lateral tilting of the patella, tenderness over the lateral patellofemoral joint and medial joint line, range of motion of 0 to 115 degrees, stability of the knee, moderate quad weakness, and intact sensation. (*Id.* at 590.) Dr. Kemmler put in requests for physical therapy and Synvisc One injection. (*Id.*) Dr. Kemmler placed Madlock in a lateral stabilizer to help support the knee during activities. (*Id.*) Madlock wanted to continue with regular duty at work. (*Id.*)

On February 14, 2020, Madlock saw Dr. Kemmler for follow up. (*Id.* at 929.) On examination, Dr. Kemmler found Madlock continued to walk with a limp. (*Id.* at 930.) Dr. Kemmler further found near full knee extension, flexion to approximately 115 degrees, moderate quad weakness, tenderness over the proximal patellar tendon and medial joint line, pain with patellofemoral grind testing, stability of the joint, and intact sensation. (*Id.*) Dr. Kemmler directed Madlock to continue with daily activities and put him on work restrictions. (*Id.*)

On February 28, 2020, Madlock saw PAC Kohne for follow up and reported that while the Synvisc injection did not help, the knee brace had helped. (*Id.* at 931.) On examination, Kohne found improving

strength and range of motion, continued discomfort over the distal femur and proximal medial tibia region, and intact sensation.  (*Id.* at 932.)

On April 24, 2020, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 933.)  On examination, Dr. Kemmler found unchanged physical findings.  (*Id.* at 934.)  Dr. Kemmler determined:

> At this juncture the patient has failed conservative treatment due to the osteochondral lesion of the medial femoral condyle of the right knee. This is his primary area of symptomatology. At this juncture, therefore, the next step would be, in my opinion, an osteochondral graft. This would have a good chance of warding off the need for a total knee arthroplasty, as well as hopefully making the patient much more comfortable. The patient would like to go this route. We will put in for approval through Workman's Compensation.

(*Id.*)

On May 27, 2020, Madlock underwent the osteochondral grafting procedure.  (*Id.* at 1148.)

On June 9, 2020, Madlock saw PAC Kohne for his two-week post-op examination.  (*Id.* at 937.)  On examination, Kohne found a healing incision and a limited active range of motion.  (*Id.* at 938.)  Kohne noted Madlock was to remain non-weight bearing and would follow up with their office in three weeks.  (*Id.*)

On June 26, 2020, Madlock saw Dr. Kemmler for follow up and reported he felt he was "progressing well."  (*Id.* at 940.)  Madlock remained non-weight bearing, and he was using crutches.  (*Id.*)  On examination, Dr. Kemmler found mild residual swelling, near full extension, flexion to approximately 95 degrees, and intact sensation.  (*Id.* at 941.)  Dr. Kemmler directed Madlock to continue with non-weight bearing and to continue to work on quad isometrics and range of motion.  (*Id.*)

In July 2020, Madlock saw Dr. Kemmler for follow up and reported "gradual progress" since his last appointment.  (*Id.* at 942.)  Madlock told Dr. Kemmler he had occasional quad pain and medial knee discomfort.  (*Id.*)  On examination, Dr. Kemmler found range of motion of 0 to 110 degrees, moderate global weakness, stability of the joint, and no pain with range of motion.  (*Id.* at 943.)

On September 4, 2020, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 944.)  Madlock reported improved knee pain, which he rated as a 4/10, as well as intermittent numbness and tingling.  (*Id.*)  He continued with physical therapy and therapy taping.  (*Id.*)  Dr. Kemmler noted Madlock had progressed from using crutches to using a cane, and Madlock was taking Meloxicam for pain management.  (*Id.*)  On examination, Dr. Kemmler found Madlock walked with a limp, as well as mild swelling, improving strength, range of motion of 5 to 105 degrees, subjective pain with range of motion, no significant tenderness, stability of the joint, and intact sensation.  (*Id.* at 944-45.)

On October 6, 2020, Madlock received a Depo Medrol and Sensorcaine injection in the right knee. (*Id.* at 946-47.)

On October 27, 2020, Madlock saw Lynn Hemmelgarn, PT, for physical therapy.  (*Id.* at 1313, 1315.)  Madlock reported continued improvement but noted swelling with prolonged weight-bearing.  (*Id.* at 1313.)  Madlock told Hemmelgarn he could tolerate two to three hours of weight-bearing, he could climb stairs with the use of a rail, and he could grocery shop and vacuum.  (*Id.*)  He could not kneel or crawl.  (*Id.*)  He described his worst pain as a 4/10 with prolonged weightbearing.  (*Id.*)  Madlock reported he was not working at the time because there was no light duty work available at his job.  (*Id.*)  On examination, Madlock demonstrated range of motion of 0-138 degrees, positive Thomas test, normal gait pattern that became "mildly antalgic" with fatigue, 4+/5 right knee and quad strength with mild pain, and 5/5 right hamstring strength.  (*Id.*)  Hemmelgarn opined that Madlock had demonstrated "significant progress over the past month with increased weight bearing tolerance allowing improved ADL and weight bearing tolerance," although Madlock continued to have "moderate pain levels with prolonged weight bearing that would affect his ability to return to work at this time."  (*Id.* at 1414.)

On November 3, 2020, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 1025.)  Madlock reported that the injection did not help his knee pain, which Madlock rated as a 4/10.  (*Id.*)  Madlock told Dr.

7

Kemmler he was taking Tylenol occasionally and he was out of Meloxicam.  (*Id.*)  Madlock reported he was not working because his job did not have any light duty work for him to perform.  (*Id.*)  Madlock endorsed some numbness and tingling but denied swelling.  (*Id.*)  Madlock denied any radiation of the pain from his knee.  (*Id.*)  On examination, Dr. Kemmler found a near symmetric gait, no gross effusion, no warmth, no erythema, no tenderness, mild weakness, stability of the joint, no pain with McMurray's testing, range of motion of 0 to 115 degrees, and intact sensation.  (*Id.* at 1025-26.)  Dr. Kemmler recommended continued daily exercises, physical therapy, and work restrictions.  (*Id.* at 1026.)  Dr. Kemmler also ordered an FCE.  (*Id.*)

On November 25, 2020, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 1027.)  Madlock reported that his knee started to spasm and feel weak after walking for about four to five hours the day before.  (*Id.*)  Madlock also endorsed intermittent tingling with the swelling.  (*Id.*)  He rated his pain as a 5/10 and told Dr. Kemmler he was taking Tylenol for the pain.  (*Id.*)  Worker's Comp told Madlock to finish physical therapy before undergoing an FCE.  (*Id.*)  On examination, Dr. Kemmler found a mildly asymmetric gait, full extension, flexion to 115 degrees, mild medial joint tenderness, no pain with McMurray's testing, stability of the joint, mild global weakness, and intact sensation.  (*Id.* at 1027-28.)

On January 3, 2021, Madlock saw Dr. Kemmler for follow up and reported near constant anteromedial knee pain that Madlock rated as a 4/10.  (*Id.* at 1031.)  Madlock endorsed numbness and tingling in the same area, as well as occasional knee swelling.  (*Id.*)  Walking and standing aggravated his pain.  (*Id.*)  Madlock told Dr. Kemmler his knee buckled at times; it had happened over Christmas, and he had fallen into a shelf.  (*Id.*)  Madlock took Tylenol a few times a week, and he continued to do his home exercise program and go to physical therapy.  (*Id.*)  Dr. Kemmler noted Madlock was to undergo an FCE in two to three weeks.  (*Id.*)  On examination, Dr. Kemmler found unchanged physical findings.  (*Id.* at 1032.)  Dr. Kemmler told Madlock he did not feel that more surgery was necessary at this point.  (*Id.*)  Dr.

Kemmler recommended Madlock proceed with his FCE and return to care for further evaluation after that. (*Id.*)

On January 25, 2021, Madlock underwent a functional capacity evaluation ("FCE") with Matt Dwenger, PT.  (*Id.* at 1536.)  Madlock reported independence with self-care and the ability to do some chores, but he had right knee pain and he avoided doing home management tasks and outdoor work.  (*Id.* at 1537.)  He told Dwenger he did hardly any physical activity because of his knee pain.  (*Id.*)  Madlock thought he could stand for one hour in an eight-hour workday because of knee pain and feeling like his knee will give out.  (*Id.* at 1538.)  He thought he could work with his pain level at a 4/10 as long as his knee would not give out.  (*Id.*)

On examination, Dwenger found Madlock sat with his right leg out in front of him with less knee flexion.  (*Id.* at 1539.)  Madlock stood with his right leg out to the side and leaned to the left to avoid putting weight on his right leg.  (*Id.*)  Dwenger further found 4/5 right knee strength with pain complaints with all quadricep and hamstring testing.  (*Id.*)  Madlock's right knee range of motion was limited to 125 degrees, while left knee range of motion was 145 degrees.  (*Id.* at 1540.)  Madlock stopped treadmill testing after 30 seconds because of limping, increased pain, and feeling like he could not keep up with the treadmill.  (*Id.* at 1542.)  Dwenger noted Madlock walked with his right leg turned into external rotation for comfort.  (*Id.*)  During lifting and carrying testing, Madlock "performed all lifting with almost entire use of left LE and minimal or no use of the right LE due to pain."  (*Id.* at 1543.)

Dwenger opined that, based on the FCE, he would place Madlock in the sedentary category, based on Madlock's ability to lift 29 pounds from floor to knuckle height and his inability to use his right lower extremity to help with lifting.  (*Id.* at 1536.)  However, Dwenger noted that Madlock's treadmill test results called this conclusion into question, since Madlock was unable to perform even the lowest level. (*Id.*)  Dwenger stated it was "questionable" whether Madlock could complete any work activities safely

while standing "considering his pain level and limited appropriate use of the right LE for all testing." (*Id.*) Madlock "appeared to perform all tests to the best of his ability." (*Id.*)  He seemed to "struggle with all activities due to having significant amounts of pain in the right LE with use." (*Id.*)

On February 19, 2021, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 1033.)  Madlock complained of continued right knee pain that he rated as a 4/10, as well as tingling when he touched the knee and "constant swelling" that he could not get to go away.  (*Id.*)  On examination, Dr. Kemmler found mild asymmetric gait, full extension, flexion to 115 degrees, no warmth or erythema, mild medial joint line tenderness, no pain with McMurray's testing, stability of the joint, mild global weakness, and intact sensation.  (*Id.* at 1033-34.)  Dr. Kemmler noted he had reviewed the FCE and "[t]he assessment is that he certainly has limitations," although Dr. Kemmler found the suggestion for further testing and a second opinion inappropriate.  (*Id.* at 1034.)  Dr. Kemmler stated, "At this juncture, the FCE, in my opinion, was not very helpful." (*Id.*)  Dr. Kemmler kept Madlock on the same restrictions.  (*Id.*)  Dr. Kemmler ordered lab work, including rheumatoid analysis, although Dr. Kemmler doubted that was the issue.  (*Id.*)  Dr. Kemmler told Madlock he was unsure what the next step would be, although he suggested putting Madlock back on Mobic.  (*Id.*)  Madlock told Dr. Kemmler he did not want a second opinion.  (*Id.*)

On June 29, 2021, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 1150.)  Madlock reported continued constant right knee pain, which Madlock described as "sharp to aching" and rated as a 7/10. (*Id.*)  He told Dr. Kemmler the pain was the worst with standing and walking.  (*Id.*)  Madlock also complained of mild swelling and occasional buckling, as well as some anterior numbness.  (*Id.*)  Dr. Kemmler noted Madlock was taking Tylenol as needed, icing, using a brace as needed, and doing a home exercise program.  (*Id.*)  On examination, Dr. Kemmler found mild asymmetric gait, mild effusion of the right knee, range of motion from 5 to 105 degrees, moderate quad weakness, joint tenderness over the

medial joint line, no pain with McMurray's testing, and intact sensation.  (*Id.* at 1152.)  Dr. Kemmler directed Madlock to continue his daily exercise and medications, and to return in four to six weeks.  (*Id.*)

On August 20, 2021, Madlock saw Dr. Kemmler for follow up.  (*Id.* at 1153.)  Madlock reported continued daily right knee pain, although he denied swelling and tingling since his last appointment.  (*Id.*)  Weightbearing activities exacerbated his pain.  (*Id.*)  On examination, Dr. Kemmler found continued mild swelling of the right knee, mild limitation of extension, flexion to 110 degrees, discomfort with range of motion, mild pain with McMurray's testing, moderate quad weakness, and intact sensation.  (*Id.* at 1154.)  Dr. Kemmler directed Madlock to continue with his daily exercises and current medications.  (*Id.*)  He noted Madlock was seeing a rheumatologist soon.  (*Id.*)  Dr. Kemmler told Madlock to return in two months.  (*Id.*)

On September 1, 2021, Dr. Kemmler completed an Orthopedic Specialist Medical Statement.  (*Id.* at 1156-57.)  Madlock's symptoms consisted of right knee pain and swelling.  (*Id.* at 1156.)  Dr. Kemmler listed tenderness, effusion, and pain with range of motion and ambulation as the clinical findings and objective signs supporting his opinion.  (*Id.*)  Dr. Kemmler failed to opine how long Madlock could sit and stand/walk in an eight-hour workday.  (*Id.*)  Dr. Kemmler opined Madlock would need to take unscheduled 15-minute breaks twice a day because of pain, paresthesia, and numbness.  (*Id.*)  Dr. Kemmler further opined Madlock would be off task 10% of the workday.  (*Id.*)  He further opined Madlock would have good days and bad days, and he would be absent about two days a month.  (*Id.* at 1157.)  Dr. Kemmler marked that clinical findings and laboratory/test results were "reasonably consistent" with Madlock's symptoms and Dr. Kemmler's opinions.  (*Id.*)

On October 7, 2021, Madlock saw rheumatologist Jisna Paul, MBBS, for follow up.  (*Id.* at 2367.)  Dr. Paul noted previous blood work showed a positive ANA.  (*Id.*)  Dr. Paul determined that while Madlock continued to have a positive ANA, the rest of the workup did not reveal evidence of an active

underlying autoimmune disease.  (*Id.*)  Dr. Paul recommended aspiration of knee fluid to try to determine the "probable etiology" for Madlock's recurrent right knee swelling.  (*Id.*)

On December 17, 2021, Madlock saw Dr. Kemmler for follow up and reported continued knee pain that Madlock rated as a 6/10, as well as continued numbness, tingling, and swelling.  (*Id.* at 2383.) Madlock told Dr. Kemmler he continued to take Tylenol as needed and continued to be on work restrictions.  (*Id.*)  On examination, Dr. Kemmler found moderate right knee weakness, "[v]ery mild swelling," tenderness over the medial joint line, some pain with McMurray's testing, and intact sensation. (*Id.* at 2384.)  Madlock wanted to move forward with repeat arthroscopy because of his continued pain. (*Id.*)

On February 1, 2022, Madlock saw Dr. Kemmler for follow up and reported continued diffuse pain, intermittent swelling, and knee buckling.  (*Id.* at 3958.)  Madlock rated his pain as a 6/10 on average and described it as throbbing.  (*Id.*)  He took Tylenol as needed and used a brace and a cane as needed. (*Id.*)  Dr. Kemmler noted Madlock remained off work with restrictions.  (*Id.*)  Madlock had received second and third opinions.  (*Id.*)  On examination, Dr. Kemmler found mild asymmetry of gait, no swelling, tenderness over the medial joint line, minimal pain with McMurray's testing, mild limitation of range of motion, and mild global weakness.  (*Id.* at 3960.)  Madlock wanted to move forward with a diagnostic arthroscopy.  (*Id.*)  Dr. Kemmler noted Madlock understood that his treatment may result in a total knee replacement.  (*Id.*)

A February 9, 2022 MRI of the right knee revealed operative changes, extensive cartilage thinning and irregularity with underlying reactive marrow edema, and findings suspicious for a small, nondisplaced subchondral insufficiency facture.  (*Id.* at 3955-56.)

On March 29, 2022, Madlock underwent a second right knee arthroscopy with chondroplasty.  (*Id.* at 3953-54.)

On May 24, 2022, Madlock saw PAC Kohne for a post-operative follow up examination.  (*Id.* at 3946.)  Madlock denied improvement since surgery and reported continued constant knee pain that he described as aching and rated as a 6/10.  (*Id.*)  Weight-bearing exacerbated the pain.  (*Id.*)  Madlock told Kohne he was using a crutch, so he wasn't sure if his knee was buckling.  (*Id.*)  Madlock reported Mobic did not help his pain.  (*Id.*)  On examination, Kohne found an active range of motion of 100 degrees with flexion, "significant discomfort over the right medial joint line," discomfort with McMurray's testing, and stability of the joint.  (*Id.* at 3948.)  Kohne continued Madlock's current work restrictions and directed him to continue to bear weight as tolerated, weaning off the crutch over the course of the next week.  (*Id.*)  Kohne administered a steroid injection to help with Madlock's continued knee pain.  (*Id.*)

On August 9, 2022, Madlock saw Dr. Kemmler for follow up and reported he had seen Dr. Byrd for a second opinion on July 29, 2022.  (*Id.* at 3928.)  Dr. Byrd recommended a total knee replacement.  (*Id.*)  Madlock complained of continued right knee pain, for which he was taking Tylenol and Meloxicam, and he continued to be off work.  (*Id.*)  On examination, Dr. Kemmler found a mild antalgic gait, mild swelling, tenderness, no gross instability of the joint, flexion to 105 degrees, near full extension, and moderate quad weakness.  (*Id.* at 3930.)  Dr. Kemmler agreed the next step was a total knee replacement.  (*Id.*)

On December 2, 2022, Madlock underwent a total knee replacement.  (*Id.* at 3027.)

On January 27, 2023, Madlock saw Dr. Byrd for a post-operative examination and reported he had discontinued narcotic pain medication and was not using an assistive device apart from a cane for long walks.  (*Id.* at 3014.)  On examination, Dr. Byrd found a range of motion from under 5 extension to 120 flexion, 5/5 knee extension strength, negative quad testing, and negative Homan's sign.  (*Id.* at 3015.)

On February 20, 2023, Madlock saw Dr. Byrd for follow up.  (*Id.* at 3016.)  Madlock reported he was not using any assistive devices.  (*Id.*)  On examination, Dr. Byrd found minimal tenderness, minimal

effusion, no crepitus with range of motion, range of motion from 3 to 110 degrees, stability of the knee, 5/5 knee extension strength, negative quad lag, and negative Homan's sign.  (*Id.* at 3017.)

On June 27, 2023, Madlock saw Dr. Byrd for follow up and reported having "a relatively pain free knee," although Madlock had not recovered to the extent he had hoped despite undergoing physical therapy.  (*Id.* at 3021.)  Madlock told Dr. Byrd his recent FCE had assigned him to a level of sedentary work, but Madlock did not want to return to work in that capacity and did not want to apply for disability.  (*Id.*)  Madlock wanted to attend vocational rehab and work hardening.  (*Id.*)

On October 19, 2023, Madlock saw Dr. Byrd for follow up.  (*Id.* at 3024.)  Madlock reported having increased what he was doing in physical therapy, but he was struggling with swelling.  (*Id.*)  Dr. Byrd noted Madlock was in vocational rehab.  (*Id.*)  Dr. Byrd noted Madlock was doing well and told Madlock swelling was a post-surgical complication that could last for some time.  (*Id.* at 3025-26.)

## C.    State Agency Reports

On March 7, 2020, Gail Mutchler, M.D., reviewed the file and opined that Madlock could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds.  (*Id.* at 79, 81.)  His ability to push and/or pull was unlimited, other than shown for lift and/or carry.  (*Id.* at 80.)  He could sit and stand and/or walk for about six hours in an eight-hour workday.  (*Id.*)  He could frequently climb ramps and stairs, and occasionally climb ladders, ropes, and scaffolds.  (*Id.*)  He could frequently balance, kneel, and crouch.  (*Id.*)  His ability to stoop and crawl was unlimited.  (*Id.*)

On July 9, 2020, on reconsideration, Abraham Mikalov, M.D., affirmed Dr. Mutchler's findings.  (*Id.* at 98-99.)

## D.    Hearing Testimony

During the January 30, 2024 hearing, Madlock testified to the following:

- He underwent his first knee surgery on June 9, 2019.  (*Id.* at 2651-52.)  He was released to go back to work as a press operator in the fall of 2020.  (*Id.* at 2653.)  He started to have complications when he went back to work, so he was pulled off work

again.  (*Id.*)  He worked for one month before being pulled off work.  (*Id.*)  Standing for eight hours was too hard for him.  (*Id.* at 2654.)  His knee continued to swell and hurt.  (*Id.*)  His doctor administered some injections, but they didn't work, so Dr. Kemmler took him off work to get an MRI.  (*Id.*)  The MRI revealed bone on bone, a hole in his knee, and a fracture.  (*Id.*)  He underwent a chondral lesion with a stem cell in May 2020, where Dr. Kemmler took out the cracked bone and put in a stem cell with a graft.  (*Id.* at 2654-55.)  He used a walker for three months after that surgery because he could not move his knee.  (*Id.* at 2655-56.)  He used a crutch for a month and a half after that.  (*Id.* at 2656.)  He then got a cane.  (*Id.*)  He underwent physical therapy, and he fell several times.  (*Id.* at 2656-57.)  He was able to lift two to five pounds in the fall of 2020.  (*Id.* at 2658.)

• He underwent another arthroscopic knee surgery in 2021.  (*Id.* at 2659.)  The second surgery did not improve his pain.  (*Id.* at 2660.)  He underwent a functional capacity evaluation, and doctors told him his knee was "done."  (*Id.*)  He wanted to get a second opinion, and the new doctor told him the same thing – he could not have any more surgery other than a knee replacement.  (*Id.* at 2661.)

• He switched doctors and underwent a knee replacement in 2022.  (*Id.* at 2659.)  He continued to use a cane up until his knee replacement.  (*Id.* at 2663.)  He is still healing from his knee replacement.  (*Id.* at 2665.)  His doctor said that because he is a diabetic, it may take him longer to recover.  (*Id.*)  He is currently in vocational rehab.  (*Id.* at 2666.)  His doctor said physical therapy would no longer help restrengthen his leg.  (*Id.*)  His thigh muscle is weaker than it should be, which is making his knee and leg weak.  (*Id.*)  He underwent full body therapy training for two months to try to build up his muscles.  (*Id.* at 2667.)  Vocational rehab told him he could work anywhere that he could use his hands and not stand for more than four hours.  (*Id.* at 2669.)

• His current pain level is a 5/10.  (*Id.*)  His pain is constant.  (*Id.*)  He takes two Tylenol in the morning and two Tylenol at night.  (*Id.*)  His legs occasionally give out on him.  (*Id.* at 2681-82.)  He fell once after his legs gave out.  (*Id.* at 2682.)  It happened when he was trying to go up the stairs.  (*Id.*)  He cannot start with his right leg when he is climbing stairs.  (*Id.*)  He has trouble carrying things up and down stairs.  (*Id.* at 2683.)  He can bend down to pick things up if he is on a flat surface.  (*Id.* at 2684.)  He can carry 35-45 pounds on a flat surface.  (*Id.*)  He has a little trouble walking when grocery shopping, but he can do it if he wears his knee brace and isn't there long.  (*Id.*)  He cannot sit for long because his feet go numb.  (*Id.*)  He can sit for about 20 minutes before he needs to change positions.  (*Id.*)

• He elevates his legs at night because he tries to stay active during the day.  (*Id.*)  He needs to elevate them to try and get the swelling down.  (*Id.* at 2684-85.)  He elevates them for about 30 minutes and ices them for about 15 minutes.  (*Id.* at 2685.)  The longest he has stood without his cane is maybe half an hour, and he needs to lean on his left leg the whole time.  (*Id.*)  He can walk for about a half an hour to an hour before he would need to stop.  (*Id.*)

The VE testified Madlock had past work as a punch press operator and forklift operator.  (*Id.* at 2689.)  The ALJ precluded past relevant work on the record.  (*Id.*)  The ALJ then posed the following hypothetical question:

> I'm going to start out with a younger individual with a limited education. Initially, I'm going to say light work.  No climbing ladders, ropes, and scaffolds.  No climbing stairs.  No kneeling.  No crawling.  Engaging in the remaining postural activities, I'm going to say no squatting and engaging in the remaining postural activities on an occasional basis.  I'm going to say no assembly line work dictated by an external source.  No commercial driving. No dangerous machinery.  No unprotected elevations.  No extreme temperatures.  I'm going to say no pushing with the right foot.  I'm going to say occasional overhead reaching.  I'm going to say no foot controls.  And I'm going to ask for three occupations with a national number and a DOT.  Hypo #1.  Thank you.

(*Id.* at 2690.)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as bagger, hand presser, and cashier.  (*Id.*)

The ALJ modified the hypothetical to limit the hypothetical individual to no overhead reaching and standing and walking for four hours.  (*Id.* at 2690-91.)  The VE testified the hypothetical individual would be limited to sedentary work.  (*Id.* at 2691.)

The ALJ then posed a sedentary hypothetical:

> My sedentary hypothetical shall be – hypo #1 for sedentary will be a younger individual, high school education, sedentary work.  No climbing ladders, ropes, and scaffolds.  No climbing stairs.  No squatting, kneeling, or crawling. And again, those remaining posturals will be on an occasional basis.  No assembly line work dictated by an external source.  No commercial driving. The same environmentals: no dangerous machinery; no unprotected elevations; no extreme temperatures.  No pushing with the right foot.  No foot controls.  Occasional overhead reaching.  Can I please have three occupations with a national number and a DOT?  Thank you.

(*Id.*)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as order clerk, inspector, and packer.  (*Id.*)

16

The ALJ further modified the hypothetical to no overhead reaching.  (*Id.*)  The VE testified the same jobs would remain.  (*Id.* at 2692.)

The ALJ further modified the hypothetical for occasional use of a cane to walk and stand up throughout the workday.  (*Id.*)  The VE testified that this would be an accommodation.  (*Id.*)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*, 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do

basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Madlock was insured on the alleged disability onset date, June 9, 2019, and remained insured through December 31, 2023, the date last insured ("DLI"). (Tr. 2617-18.) Therefore, in order to be entitled to POD and DIB, Madlock must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.   The claimant has not engaged in substantial gainful activity since June 9, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: hypertension; diabetes; right knee osteoarthritis; cervical degenerative disc disease and radiculopathy; right carpal tunnel syndrome, status post release surgery; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: never climb ladders, ropes, scaffolds, or stairs; never kneel, squat, or crawl; occasionally climbs ramps, balance, stoop, or crouch; occasionally reach overhead; no operation of foot controls; no pushing with the right foot; no assembly line work, with the pace dictated by an external source; no commercial driving; and no exposure to dangerous machinery, extreme temperatures, or unprotected elevations.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on June **, 1978 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 9, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 2620-37.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Madlock argues that the ALJ erred in reviewing the opinions of treating physician Dr. Kemmler.  (Doc. No. 6 at 8.)  Madlock asserts that the ALJ's finding that Dr. Kemmler's opinions were unpersuasive lacks the support of substantial evidence.  (*Id.*)  In addition, the ALJ's analysis failed to comply with 20 C.F.R. § 404.1520c as the ALJ failed to properly consider the supportability and consistency of the opinions.  (*Id.*)  Madlock maintains:

> From the outset, it is important that this Court understand that the issue being raised is not simply a disagreement with how the evidence was being weighed. Mr. Madlock is not arguing that the ALJ simply interpreted the medical evidence wrong and that the record documented greater restrictions. It is understood that it is the ALJ's job to evaluate the record and determine a claimant's limitations. Instead, this issue is about the requirements set forth in 20 C.F.R. § 404.1520c. This issue is about the ALJ's legal obligation to consider and explain how each factor – supportability and consistency – affected the persuasiveness of Dr. Kemmler's opinion. Therefore, it does not matter if the ALJ relied more heavily on the state agency opinions. It is not relevant whether the ALJ can point to other evidence to support the residual functional capacity. What does matter is whether the ALJ complied with the

> regulation. What matters is whether the ALJ considered the supporting explanations provided by Dr. Kemmler as well as the other medical and non-medical evidence of record and whether that evidence was consistent with Dr. Kemmler's opinions. Finally, what matters is whether the ALJ adequately explained how that evidence, or lack thereof, affected the persuasiveness of Dr. Madlock's opinions.

(*Id.* at 10.)

Madlock argues that the ALJ erred in the supportability analysis, as "the ALJ simply concluded that Dr. Kemmler failed to provide support for his opinions that Mr. Madlock would require additional breaks, or would be off-task, or would miss multiple days of work per month." (*Id.* at 11.)  Madlock then recites evidence that he maintains supports Dr. Kemmler's limitations. (*Id.* at 12-13.)  Madlock asserts that instead of addressing this support, "the ALJ claimed Dr. Kemmler failed to provide support," in contravention of the record evidence. (*Id.* at 13.)  In addition, Madlock maintains that his ability to keep a 30–45-minute medical appointment is not the same as maintaining regular attendance for a full time position, and maintaining attention for an exam of that length is not inconsistent with the opinion that Madlock would need two additional breaks during the workday. (*Id.* at 14.)  Therefore, Madlock argues, the ALJ's reasoning rejecting Dr. Kemmler's opinion is insufficient. (*Id.*)

Madlock further asserts that the ALJ erred in evaluating the consistency of Dr. Kemmler's opinions, as the ALJ failed to compare it to other evidence in the record, including the functional capacity evaluation, as required by the regulations. (*Id.*)

The Commissioner responds that the ALJ considered the supportability and consistency of Dr. Kemmler's opinions, "both within the specific paragraph in which she evaluated [Dr. Kemmler's] various opinions and in the broader decision." (Doc. No. 8 at 1.)  The Commissioner argues the ALJ found several of the opinions to be vague, and that Dr. Kemmler offered no response in a checkbox questionnaire to the question of how long Madlock could sit and stand in an eight-hour period. (*Id.* at 13.)  The ALJ also discussed how treatment records, including Dr. Kemmler's, failed to support the need for

disabling work breaks and absences, which shows consideration of both supportability and consistency. (*Id.*) Furthermore, Madlock fails to challenge the ALJ's subjective symptom analysis on judicial review, and Madlock's subjective complaints were the express basis for Dr. Kemmler's opinions regarding Madlock's need for breaks and absences from work. (*Id.* at 14.)

In reply, Madlock argues that "just because a provider chooses not to provide an opinion on a specific area of functioning, does not mean that the opinion as a whole is any lesser [sic] persuasive." (Doc. No. 9 at 2.) Madlock asserts that the ALJ "nitpicked" Dr. Kemmler's opinion in his medical source statement. (*Id.*)

Since Madlock's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5)

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).
[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the opinions of Dr. Kemmler as follows:

> The record includes numerous opinion statements from the claimant's former orthopedic surgeon, James Kemmler, M.D. In mid-2019, Dr. Kemmler limited the claimant to sedentary work (3F/9-12; 21F/52). Around that same time, Dr. Kemmler wrote the claimant should remain off work for just a few months following his April 2019 right knee arthroscopy (21F/86). Then in 2020, Dr. Kemmler gave inconsistent statements, first limiting the claimant to sedentary work in early to mid-2020, then returning him to light duty in October 2020, but finally limiting the claimant to sedentary work in November 2020 (10F/4; 21F/99-100, 167, 176 & 186).

> Throughout 2021, Dr. Kemmler limited the claimant to sedentary work, but simultaneously recommended continued daily exercise and activity as tolerated (21F/196, 212, 218, 228, 231 & 233). Finally, in August 2021, Dr. Kemmler limited the claimant as follows: requires unscheduled breaks twice per day, lasting 15 minutes each; off task 10 percent of the workday; and absent 2 days per month (17F). Dr. Kemmler has specialized knowledge. However, he does not have programmatic knowledge. Further, his assessments are vague, only generally limiting the claimant to sedentary or light work, but failing to specify how many hours in the day the claimant could actually sit, stand, or walk, how many pounds the claimant could actually lift or carry, how frequently the claimant could perform postural movement, or the degree to which the claimant could tolerate environmental factors. Additionally, Dr. Kemmler's assessments are inconsistent with the claimant's own statements. Specifically, the claimant's reported he was walking 2 to 3 hours at a time, and then later 4 to 5 hours at a time, which contradicts a restriction to sedentary work. Dr. Kemmler's assessments are also internally inconsistent, at times returning the claimant to sedentary work, then light work, but also temporary time off work, and finally no work at all, based on disabling off task behavior/breaks. Further, Dr. Kemmler has not treated the claimant for over 2 years, making his assessments less compelling, particularly in light of the claimant's progress in physical therapy following

25

his 2022 right knee replacement. Treatment notes also fail to support disabling breaks and absences as Dr. Kemmler opined, as the claimant was not frequently distracted during medical appointments, nor did he require breaks during physical therapy sessions, and finally, he did not frequently cancel or no- show to his medical appointments. Finally, statements that a claimant is "disabled", "unable to work", "can or cannot perform a past job", or "meets a listing", or the like, are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the regulations and legal standard set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate the statutory responsibility to determine the ultimate issue of disability, even to another governmental agency. Accordingly, opinions on issues reserved to the Commissioner are inherently neither valuable nor persuasive (20 CFR 404.1520b(c) and 416.920b(c)). For these reasons, I find the opinions of Dr. Kemmler to be unpersuasive.

(Tr. 2632-33.)

Elsewhere in the RFC analysis, the ALJ found as follows:

In early 2021, the claimant attended a functional capacity evaluation, during which he demonstrated left side leaning when standing to reduce pressure on his right knee, and difficulty walking on a treadmill for even 30 seconds. On the other hand, the claimant's strength was still just slightly diminished in the right knee—4 out of 5, and 5 out of 5 in other regions, he demonstrated full spinal range of motion, and he was able to lift and carry a range of weight— from 30 to 70 pounds. Subsequent orthopedic notes reflect the claimant's reports of right knee pain and bucking, and associated falls, but physical examinations were unchanged. Specifically, the claimant demonstrated only mildly asymmetric gait, minimal knee swelling, and mild knee weakness, with intact lower extremity sensation and negative McMurray's. James Kemmler, M.D., the orthopedic surgeon who had performed the claimant's 2019 and 2020 right knee surgeries, noted the most recent right knee MRI was negative for evidence of lack of graft incorporation or infection. Finally, Dr. Kemmler advised the claimant to continue daily exercise and manage his pain conservatively with anti-inflammatory medication (12F/19-26; 16F/7 & 9; 18F/380-387; 19F/180-181; 21F/201 & 204-211).

(*Id.* at 2629.)

The ALJ considered the supportability and consistency of Dr. Kemmler's opinions as required by the regulations, discussing evidence that was unsupportive of disability in the process – evidence that included Madlock's own statements about his physical abilities and the gap in time between Dr. Kemmler's treatment and the ALJ's decision.  (*Id.* at 2629-33.)

26

In addition, as the Commissioner notes, the ALJ was entitled to find Dr. Kemmler's medical source statement opinion unpersuasive because it was not accompanied by an explanation of the limitations. The regulations specify that an opinion's persuasive value is based on both the objective evidence and "supporting explanations." *Duke v. Berryhill*, Case No. 21 CV 39, 2022 WL 1075171, at *3 (N.D. Ohio April 11, 2022) (citing 20 C.F.R § 404.1520c). "Courts frequently find that check-box forms, unaccompanied by explanation, are unsupported. *See, e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016) ("The Court has held that an ALJ properly discounted a treating source's questionnaire because the source failed to provide any explanation for his responses) (quotation omitted); *Gallagher v. Berryhill*, 2017 WL 2791106, at *8 (N.D. Ohio June 12, 2017)." *Duke*, 2022 WL 1075171, at *3. This applies even where the ALJ does not identify the format as a reason for rejecting the opinion. *Id.* at *3 n.2.

Here, Dr. Kemmler's medical source statement does not provide an explanation beyond stating that the medical findings included tenderness, effusion, and pain with range of motion and ambulation. (Tr. 1156-57.) Dr. Kemmler did not describe why or how these findings are relevant to additional breaks or absences, especially considering that Dr. Kemmler declined to provide any response to how long Madlock could sit, stand, and walk in an eight-hour workday. (*Id.*) For this additional reason, the ALJ was entitled to find Dr. Kemmler's opinion unpersuasive. *Duke*, 2022 WL 1075171, at *3.

Furthermore, in analyzing Madlock's subjective symptoms, the ALJ found as follows:

> The claimant has described daily activities that are not limited to the extent one would expect given the functional deficits alleged by the claimant, which is inconsistent with his statements concerning the intensity, persistence and limiting effects of his symptoms. First, the claimant described exertional intolerances—standing for just 30 minutes at one time, walking for just 30 to 60 minutes at one time, and lifting 35-45 pounds, but carrying less. The claimant also reported he elevates his legs at night, for at least 30 minutes, to manage his lower extremity swelling. However, as outlined above, in 2020 the claimant told medical providers he could weight bear for 2 to 3 hours at a time. Then in 2021, the claimant described walking independently for 4 to 5

hours at a time. Further, in 2023 the claimant was able to safely lift 45 to 85 pounds. Finally, the record reflects no more than minimal right knee swelling, with no medical provider formally recommending regular leg elevation, as the claimant described. In fact, a rheumatologist declined to perform right knee aspiration on the claimant, as his swelling was found to be so slight. Second, the claimant described use of a walker, crutches, or cane due to knee pain and associated ambulatory deficits. However, the claimant's use of an assistive device was not long-term. For example, during early 2020 physical therapy sessions, less than 12 months after his right knee arthroscopy, the claimant walked without any assistive device and performed heel slide and standing march exercises independently. During late 2020 and early 2021 physical therapy sessions, approximately 6 to 8 months after his right knee osteochondral grafting, the claimant was seen ambulating without any assistive device, and he described walking for independently for 4 to 5 hours at a time. By a July 2020 orthopedic check up, just a few months following his right knee osteochondral grafting, the claimant had weaned off crutches and was using just a single cane. At a post-operative visit in early 2023, just a few months after his right knee replacement, the claimant indicated he no longer needed an assistive device for short walks, only prolonged walking. Finally, orthopedic notes in late 2023 and early 2024, state the claimant no longer required any assistive device for ambulation.

(*Id.* at 2631-32.)   As the Commissioner points out, Madlock fails to challenge the ALJ's subjective symptom analysis on judicial review.

It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.   While Madlock would weigh the evidence differently, it is not for the Court to do so on appeal.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: May 1, 2025                         *s/ Jonathan Greenberg*
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).